DECISION
Claiming that the grand jury and petit jury selection process in Providence County is constitutionally flawed, the defendants in this criminal case have moved this Court to dismiss an indictment that charges them with murder and conspiracy. Their challenges to the jury selection system are principally premised upon claimed violations of the Sixth and Fourteenth Amendments to the United States Constitution.[1]
Distilled to its essence, the defendants contend that the indicting grand jury and any petit jury empanelled under the current jury selection methods reflect unconstitutional under representations of and purposeful discrimination "against minorities, Blacks, Hispanics, and residents of Providence, Central Falls and Pawtucket." Defendants' Memorandum at 30.[2]
The Court disagrees.
* * * * *
On May 23, 1997, the grand jury returned its indictment in this case. The defendants, who were without means to retain private attorneys, were thereafter provided with able court-appointed counsel who were accorded ample funds by the Court in order to engage a qualified expert to assist them. Some years elapsed before the defendants and the State finally filed all of their memoranda and their experts' reports. The defendants filed their most recent memorandum on February 20, 2003.
The Court recognizes that much of the delay is attributable to the protracted discovery process related to retrieving and reviewing petit and grand jury records and the preparation of the reports of their respective experts. The parties agreeably consented to providing each other with generous enlargements of time to complete their efforts. Mindful of the implication and the import of the issues underlying this motion, and cognizant that the defendants have been admitted to bail and are not incarcerated, the Court therefore granted the parties' requests not to set unduly restrictive time tables or deadlines.
Nonetheless, on several occasions the Court was constrained to express its concern to the parties over the inordinately long period that it was taking them to prepare their pleadings such that this motion was ripe for consideration and disposition by the Court. On January 13, 2003, this Court again met with counsel and renewed those sentiments.
At that January 13 conference, defense counsel expressed a desire for an evidentiary hearing on the instant motion. On January 17, 2003, the Court entered an Order noting that such an evidentiary hearing would not be had unless the Court was first satisfied, from all of the pleadings, that the defendants had established a requisite prima facie case in support of their claims pursuant to Duren v. Missouri, 439 U.S. 357, 364 (1979) and its progeny. No objection to that Order has been lodged by any party.
The parties have now submitted their full complement of pleadings. The defendants' filings comprise two memoranda of law (hereafter "Defendants' Memorandum" and "Defendants' Reply Memorandum") and two Affirmations, with multiple statistical exhibits thereto, in the form of reports by their expert, Dr. Andrew A. Beveridge (hereafter "Beveridge I and/or II"). The State's materials include a responsive legal memorandum, together with an Affidavit by its expert, Dr. Stephan Michelson, in the form of a report that also includes several statistical exhibits (hereafter "Michelson").[3]
Pursuant to this Court's January 17, 2003 directive, the parties have also jointly filed a "Statement of Agreed Facts" (Exhibit A hereto) that sets forth, inter alia, the manner and means by which individuals are presently summoned for grand and petit jury service. Also attached (Exhibit B hereto) is a copy of the petit Juror Qualification Questionnaire (the grand juror questionnaire is identical to that of the petit juror questionnaire, save for its yellow color and its designation as "grand" jury). Reference will be made to Exhibits A and B as may be necessary or relevant to this Decision.
 I. SIXTH AMENDMENT CHALLENGE
The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ." U.S. Const. amend. VI. The Sixth Amendment is made applicable to the states through the Fourteenth Amendment. Taylor v. Louisiana, 419 U.S. 522, 526 (1975).
Because a jury must "be a body truly representative of the community . . . and not the organ of any special group or class," the United States Supreme Court has held that "the selection of a petit jury from a representative cross section of the community is an essential component of the Sixth Amendment right to a jury trial." Taylor, 419 U.S. at 527, 528.[4]
Although this mandate does not require that "juries actually chosen must mirror the community and reflect the various distinctive groups in the population" or that a defendant receive a jury composition of his choice, "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof."Id. at 538.
In order to establish a prima facie case for a violation of the Sixth Amendment's fair cross-section requirement, a defendant must demonstrate:
 "(1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." Duren, 439 U.S. at 364.
Failure of a defendant to substantiate any one of the three elements of the Duren test forecloses a Sixth Amendment challenge. United States v.Allen, 160 F.3d 1096, 1103 (6th Cir. 1998) ("Duren and its progeny make crystal clear that a defendant's prima facie case includes all three elements . . ., and each must be established . . . ."); accord UnitedStates v. Traficant, 209 F. Supp.2d 764, 780 (N.D.Ohio. 2002).
After juxtaposing the defendants' Sixth Amendment claims to Duren's three-part test, this Court holds herein:
 1. The defendants can show, in part, a prima facie
case as to Duren's first prong, i.e., Blacks and Hispanics are cognizable groups.
 2. The defendants' offerings under Duren's second requirement (fair cross section of the community) fail to demonstrate impermissible disparities of Blacks and Hispanics in Pawtucket or Central Falls, and their statistical claim of underrepresentation in the City of Providence does not exceed constitutional limits.
 3. The defendants' assertions as to Duren's third requisite element are wholly without merit and devoid of any showing of systematic exclusion.
Accordingly, the defendants cannot succeed in their Sixth Amendment challenge. Consideration of each of the three Duren elements is set forth below.
 1. Distinctive Group
Although the United States Supreme Court has not clearly defined "distinctive group" for the purposes of a Sixth Amendment fair cross-section analysis, courts have held that Blacks and Hispanics qualify as "distinctive" for Sixth Amendment purposes. United States v.Jackman, 46 F.3d 1240, 1246 (2d Cir. 1995) ("There is little question that both Blacks and Hispanics are `distinctive' groups in the community for purposes of [the Duren] test"); see Castaneda v. Partida, 430 U.S. 482, 495 (1977) (recognizing that "it is no longer open to dispute that Mexican-Americans are a clearly identifiable class").
Courts have, however, consistently held that community residents or groups classified by geographical location alone do not constitute cognizable classes under the fair cross-section analysis. United Statesv. Foxworth, 599 F.2d 1, 4 n. 4 (1st Cir. 1979) ("[W]e cannot see that the views and attitudes of voters of one city or town are in any way `distinct' from those of voters in a neighboring community"); Traficant, 209 F. Supp.2d at 780 ("Federal courts consistently have found that residents of a geographic area are not a distinct, cognizable group based on their place of residence alone"); United States v. Conant,116 F. Supp.2d 1015, 1024 (E.D.Wis. 2000) ("[E]very court that has looked at the question of whether the residents of a geographic area may constitute a `distinctive' group for Sixth Amendment purposes solely due to the location of their residence has answered negatively").[5]
Although the defendants correctly assert that Blacks and Hispanics are recognized as distinctive groups, neither the residents of nor the geographical units of Providence, Central Falls or Pawtucket are cognizable or distinct groups for the purposes of the defendants' Sixth Amendment challenge, or for that matter, their equal protection claim. Part II, infra. Moreover, as held in Part I (3)(A) and Part II herein, the defendants cannot in any way, either directly or by implication, classify "renters" as a distinct or cognizable group who garner constitutional protection in these jury selection challenges.
 2. Fair and Reasonable Cross Section of the Community
Even if a defendant might show that a cognizable or distinct group has been excluded from the jury selection process, under Duren's second prong a defendant must also demonstrate that the group's exclusion from the venire was not "fair and reasonable" in relation to the number of group members in the subject community. Duren, 439 U.S. at 364. As earlier noted, a defendant has no entitlement to a jury that is a "mirror image" of the community or that reflects all of the various distinctive groups in the population. Taylor, 419 U.S. at 538; United States v. Royal,174 F.3d 1, 6 (1st Cir. 1999); State v. Courteau, 461 A.2d 1358, 1364 (R.I. 1983).
In determining what constitutes a "fair and reasonable" cross section under Duren, courts have examined statistical evidence that may, or may not, demonstrate disparities between the percentage of members of a cognizable group in the relevant community and the actual percentage of those members selected for the jury venire. Duren, 439 U.S. at 364;United States v. Weaver, 267 F.3d 231, 240 (3d Cir. 2001), cert. denied,534 U.S. 1152 (2002) (observing that "[t]he second prong of Duren . . . . is, at least in part, a mathematical exercise, and must be supported by statistical evidence").
Courts have used a variety of statistical tests to determine the extent of the claimed underrepresentation and look, in part, to the strength of these statistics to assess whether a defendant has met his burden of showing an unfair and unreasonable representation of the group in the venires. Court-tested methods have typically consisted of four types of statistical analysis: (1) absolute disparity; (2) substantial impact; (3) comparative disparity; and, (4) statistical decision (which the defendants' refer to as statistical significance). See generally,Commonwealth v. Arriaga, 438 Mass. 556, 781 N.E.2d 1253 (2003); State v.Gibbs, 254 Conn. 578, 589 nn. 12-15, 758 A.2d 327, 336 nn. 12-15 (2000).[6]
The defendants apparently would prefer that the Court focus more on the latter three matrices than on the more judicially accepted absolute disparity model, application of which is much less supportive of their claim. They additionally entreat the Court to place particular emphasis on another statistical yardstick denominated "disparity of risk."
They claim at page 17 of their Memorandum that this is a "new" and more reliable test. Suffice to say that it is neither new (it was noted almost a decade ago), nor has it been anointed as a reliable methodology in any published judicial decision.[7] Indeed, in January of this year, the Supreme Judicial Court of Massachusetts rejected its purported utility, noting, "We are not aware of any jurisdiction that has adopted this test for determining whether a defendant's constitutional rights are violated by statistical underrepresentation in the jury pool, and we decline to adopt it now." Arriaga, 438 Mass. at 567, 781 N.E.2d at 1265. This Court similarly declines the defendants' invitation to do so in this case.
As noted in the margin, the absolute disparity test has generally gained wider acceptance in the courts than any of the other equations. The First Circuit Court of Appeals has approved it, Royal, 174 F.3d at 9-10, as have others. Arriaga, 438 Mass. at 565 and n. 5, 781 N.E.2d 1264 and n. 5 (collecting cases). "Consistent with the majority of jurisdictions, we apply the absolute disparity test to determine whether underrepresentation of a group is substantial." Id.[8]
At page 24 of their Memorandum the defendants state that the "absolute disparity is 7.59% for all minorities, 2.24% for blacks and 3.65% for Hispanics." Dr. Beveridge relates these absolute disparity figures to the "voting age population." Beveridge I, ¶ 58. Accepting those calibrations, they do not rise to a level that has been held constitutionally impermissible. United States v. Hafen, 726 F.2d 21, 23 (1st Cir. 1984) (absolute disparity of 2.02% or even higher insufficient to demonstrate underrepresentation); United States v. Suttiswad,696 F.2d 645, 649 (9th Cir. 1982) (7.7% absolute disparity insufficient); United States v. Butler, 611 F.2d 1066, 1069-1070 and n. 9 (5th Cir.), cert. denied sub nom. Fazio v. United States, 449 U.S. 830
(1980) (9.14% absolute disparity not sufficient); United States v.Tuttle, 729 F.2d 1325, 1327 (11th Cir. 1984) ("[T]his circuit has consistently required an absolute disparity of over 10% . . . before aprima facie case is established"); People v. Hubbard, 217 Mich. App. 459, 475, 552 N.W.2d 493, 501 (1996) ("absolute disparities between 2 percent and 11.2 percent are considered statistically insignificant and do not constitute substantial underrepresentation" under the Sixth Amendment);see Ramseur v. Beyer, 983 F.2d 1215, 1232 and n. 18 (3d Cir. 1992) (enbanc) (collecting cases).
At page 21 of their memorandum the defendants offer another array of absolute disparity percentages: 11.14% for Providence; 1.61% for Pawtucket; and .96% for Central Falls. The Pawtucket and Central Falls percentages do not come anywhere near impermissible demarcations of absolute disparity. While the Providence calibration may approach borderline levels, it is not constitutionally excessive, and even it does not reach the 14.1% absolute disparity level that was rejected as insufficient in a New Jersey challenge. Weaver, 267 F.3d at 241, referencing Ramseur, 983 F.2d at 1233-35.[9]
 3. Systematic Exclusion
The third and final part of the Duren test — and the one that is especially fatal to the defendants' Sixth Amendment challenge — requires a defendant to demonstrate that an alleged underrepresentation is attributable to a systematic exclusion of the targeted group from the jury selection process. Although the defendants need not show intentional or purposeful discrimination (a showing that is essential to their equal protection claim), they nonetheless cannot discharge their burden of demonstrating systematic exclusion merely by offering statistical evidence and perceived percentages of the alleged disparity. UnitedStates v. Test, 550 F.2d 577, 587 (10th Cir. 1976) (observing that "[d]efendants urge . . . that this statistical disparity alone was sufficient to support the inference that blacks and Chicanos had been systematically excluded from the jury selection process . . . . We have been cited to no case, however, in which a jury selection challenge based solely on statistical evidence has been successful"); State v. DeWitt,423 A.2d 828, 831 (R.I. 1980) ("The mere recitation of these statistics, without more, is insufficient to make out a prima facie case of improper jury selection"); State v. Corpening, 129 N.C. App. 60, 64, 497 S.E.2d 303, 306 (1998) ("[S]tatistical evidence indicating a disparity between the number of minorities serving on a jury in relation to the number of minorities in the community, standing alone, is insufficient to prove that the underrepresentation is a product of systematic exclusion of the minority group"); accord People v. Bell, 49 Cal.3d 502, 529, 778 P.2d 129, 143 (1989) (recognizing that "[w]ere statistical evidence of recurring disparity alone adequate to establish a prima facie violation of the cross-section guaranty, the third prong of the Duren test would be surplusage," and further noting that "[b]y including as an element of aprima facie case a demonstration that the disparity is caused by `systematic exclusion' of members of the underrepresented group, the Supreme Court clearly intended to require more").
Thus, quite apart from their mere recitation of statistics and percentiles, the defendants must, in addition, show that the claimed systematic exclusion is a result of some improper feature of the selection process, People v. Burgener, 29 Cal.4th 833, 857, 62 P.3d 1, 20 (2003), together with at least a reliable indication as to when and why
the alleged systematic exclusion occurred. Obregon v. United States,423 A.2d 200, 206 (D.C. App. 1980) ("We do not read Duren so broadly as to hold that a statistical showing alone, without some analysis of the particular system involved, is sufficient to prove systematic exclusion. The [Duren] Court went on to point out that, not only had the petitioner there shown a statistical underrepresentation, but he had also shownexactly when in the selection process and why the exclusion occurred") (emph. added); see Duren, 439 U.S. at 366-67 (discussing when and why exclusion occurred).
Furthermore, the defendants are obliged to offer more than just speculation or surmise as to the reason for the alleged impermissible exclusion. Burgener, 29 Cal.4th at 858, 62 P.3d at 21 ("Speculation as to the source of the disparity is insufficient to show systematic exclusion").
The defendants, through Dr. Beveridge, have tendered an array of statistics and charts. Those calibrations not only fail to meet Duren's
second requisite fair cross-section element, they do not, by themselves, at all satisfy the defendants' burden of demonstrating systematic exclusion, Duren's third necessary prong. Moreover, Dr. Beveridge's barren assertions as to when and why the claimed exclusions occurred (to the extent that he has offered them at all), fall woefully short of establishing a prima facie showing of systematic exclusion. To the contrary, those assertions, in this Court's view, reflect unacceptable speculation and surmise.
A review of Dr. Beveridge's two reports discloses that after much statistical recitation, he is simply unable to conclude, in any reliable manner, that systematic exclusion has occurred; or, that if it has allegedly occurred, he cannot advance any reliable explanation as to when and why it purportedly occurred. In his initial report he suggests, "Putting it simply, it is impossible that the disparity found by town and place could have occurred by chance. Something systematic has occurred." Beveridge I, ¶ 37 (emph. added). He does not identify what that "something" is. His conclusion is, as his prefatory phrase forecasts, put too simply.
Dr. Beveridge also inappropriately alleges that there is "geographic" bias and underrepresentation in the potential juror list.[10] Beveridge I, ¶ 41. He then remarks, in what sounds far closer to a question than anything in the neighborhood of a substantiated conclusion, that "there must be something in the process of creating the list" that is causing it, and that "whatever it is" also relates to grand jury lists. Beveridge I, ¶ 42 (emph. added).
In his second report Dr. Beveridge suggests that there is minority bias in "the voter list, the DMV list or the combined lists." Beveridge II, ¶ 18. He then acknowledges, however, that because he lacks additional data, it is "impossible for me to estimate" any such bias. Id.
Thereafter, in that second report, Dr. Beveridge concedes that "at this point, we do not know if there are systematic biases with respect to minority status in the source list." Beveridge II, ¶ 19 (emph. added). Statements such as these, which so loudly ring of uncertainty, are hardly compelling support for establishing a requisite prima facie
case.
This Court is not suggesting that Dr. Beveridge is without qualified credentials to offer his views, or that he has necessarily given short shrift to his endeavors.[11] What the Court is saying, however, and what this Court finds from that which the defendants have presented, is that there exists altogether too much uncertainty and speculation in their assertions that there is systematic exclusion of minorities in the jury selection process. See Burgener, 29 Cal.4th at 858, 62 P.3d at 21, where similar acknowledgements of uncertainties by a defendant's expert also doomed the challenge to a jury selection process.
The deficiencies described above are, by themselves, reason enough to find that the defendants have not met their burden under Duren's third requisite element. Other grounds exist, as well.
In determining whether systematic exclusion has occurred, courts consider the very nature of the process by which jury lists are composed. Such considerations include for example, whether the process is randomly conducted, whether it is facially race-neutral, whether exemptions or excusals from jury service are acceptably reasonable, whether efforts to reform the system have been implemented, and whether the juror pool itself is inherently impermissible. When such considerations are juxtaposed to Rhode Island's process, no systematic exclusion can be found at all.
The pool of jurors in Providence County (and statewide) generally consists of United States citizens who are residents of the county, who have attained their eighteenth birthday, and who are either registered to vote, licensed by the Department of Motor Vehicles ("DMV") to operate a motor vehicle, or have been issued a Rhode Island Identification Card by the DMV. See generally R.I.G.L. 1956 § 9-9-1.1 (2002) (outlining qualifications of jurors).
The Rhode Island Supreme Court has upheld as constitutional the exclusive use of voter registration lists from which to enroll jurors.State v. Romano, 456 A.2d 746, 755 (R.I. 1983). Obviously, enlarging that pool to include licensed drivers and those who hold valid state identification cards is constitutionally permissible. See United Statesv. Warren, 16 F.3d 247, 252 (8th Cir. 1994) (upholding, against a Sixth Amendment challenge, a system that utilized lists of registered voters, licensed drivers, and identification cardholders). Relying on voter registration and DMV lists to summon jurors does not demonstrate systematic exclusion absent a showing that distinct groups face obstacles in registering to vote or becoming licensed to drive a motor vehicle.Johnston v. Bowersox, 119 F. Supp.2d 971, 980-81 (E.D. Missouri 2000),aff'd sub nom. Johnston v. Luebbers, 288 F.3d 1048 (8th Cir. 2002). These defendants have demonstrated no such obstacles or impediments.
The defendants conclude that the use of DMV records somehow injects a biasing effect into the system (Beveridge II, ¶ 16), but no reliable indication has been shown at all to support that barren assertion. Dr. Beveridge has conceded that not only is it "impossible" for him to estimate any such bias therein, he also admits that he cannot point to any systematic racial biases in the source list. Beveridge II, ¶¶ 18, 19.
Indeed, the very expansion of the juror pool to include DMV records is evidence that negates a fair cross-section claim and, in this Court's view, an allegation of systematic exclusion. In Ramseur v. Beyer, 983 F.2d at 1235, the Third Circuit instructively stated in language that has clear application here:
 "Moreover, the selection process was facially neutral and included names from both the voter registration and DMV lists. Additionally, the New Jersey Supreme Court found it significant that these lists were employed as part of an on-going effort in New Jersey to increase the representativeness of the State's jury lists:
 `We look to the State's efforts at reform. We are not dealing here with a system in which there has been long-standing abuse with no attempts at reform. New Jersey has been conscious of its obligation to achieve greater neutrality and representativeness in its jury selection system. The addition of the DMV lists in 1979 — at a time when very few jurisdictions, state or federal, required the use of multiple lists in addition to voter lists — was obviously intended to broaden the representativeness of the pool. In addition, a 1981 Task Force chaired by Justice Clifford to study the current jury system has made numerous recommendations that may serve to increase the representativeness of juries. We are certain that those currently working on improvements in jury procedures will continue to seek to improve the yield of jurors from the source lists.' Ramseur, 106 N.J. at 226, 524 A.2d at 239.
 Such efforts at reform to increase the representativeness of jury lists have some relevance to the question of whether a group's representation on those lists is `fair and reasonable.' If a system appears ex ante likely to create representative jury lists there should be some presumption of its legitimacy, even though evidence ex post may demonstrate that the lists are not representative enough."
So, too, Rhode Island's demonstrated efforts to expand its jury pool merit similar approbation. Prior to 1995, jurors were conscripted exclusively from voter registration lists. Thereafter, the system was expanded to include not only licensed motorists but, as well, residents to whom the DMV issued identification cards.
Further, in September of 2001, the duration of a petit juror's minimum mandated presence in the venire was shortened from two weeks to a minimum period of two days or the length of a single trial. By stipulation, the defendants have acknowledged that this modification "was implemented to give more people an opportunity to serve as jurors," and that this change was meant "to encourage more working people, minorities and low income people to serve." Exhibit A, ¶ 40.
Such modifications and reforms to this State's jury process cannot be pejoratively labeled a system of exclusion. To the contrary, from this Court's vantage point, they reflect efforts of inclusion.
Moreover, a review of Exhibit A, describing the various stages that ultimately lead to the mailing of Juror Qualification Questionnaires and the composing of jury lists, reflects a randomly computerized and facially neutral process. It is reasonably monitored and contains reasonable safeguards to avoid inappropriate disclosure of race/ethnicity;[12] and, lists are "merged and purged" in an effort to avoid duplication of names. Where, as here, the selection process is "neutral on its face and [is] monitored, and [is] modified, to try toenhance its representative character," no Sixth Amendment violation occurs. Weaver, 267 F.3d at 244 (emph. added); Ramseur, 983 F.2d at 1235; Arriaga, 438 Mass. at 567, 781 N.E.2d at 1265 (randomly generated computerized lists do not indicate systematic exclusion); accord Princev. Parke, 907 F. Supp. 1243, 1252 (N.D.Ind. 1995); Price v. State,347 Ark. 708, 727, 66 S.W.3d 653, 665 (2002); see United States v.Greene, 971 F. Supp. 1117, 1129 (E.D.Mich. 1997) (noting that "circuit courts have consistently found that drivers' license lists and voter's registration lists are `facially neutral' and allow no opportunity for subjective or racially motivated exclusions").
The defendants also intimate that requests by jurors for excusals and/or the statutory exemptions afforded some prospective jurors might somehow offer a subjective opportunity to invite systematic exclusion. Experience teaches, however, that those who are typically excused from jury service are released principally because of financial hardship or because their employers decline to compensate them during jury service, or for family and medical reasons and the like. As the United States Supreme Court has observed, "[I]t is unlikely that reasonable exemptions, such as those based on special hardship, incapacity, or community needs, `would pose substantial threats that the remaining pool of jurors would not be representative of the community.'" Duren, 439 U.S. at 370 (quoting Taylor v. Louisiana, 419 U.S. 522, 534 (1975));State v. Jenison, 122 R.I. 142, 152, 405 A.2d 3, 8 (R.I. 1979).[13]
Thus, "[g]ranting excuses based on the application of neutral criteria to prospective jurors' individual situations does not constitutesystematic exclusion." State v. Sanderson, 182 Ariz. 534, 539,898 P.2d 483, 488 (1995) (emph. added). Beyond oneiric speculation, these defendants have not shown in any way that excusal requests, either by the Jury Commissioner, or by the courts or counsel during voir dire, have been granted on grounds other than application of neutral criteria and individual needs of prospective jurors.[14]
 A. Renters
In their Reply Memorandum the defendants assert that "renter" status equates with minority status and that underrepresentation of renters in the venires is a purposeful and deliberate act by the State to exclude minorities. Because this assertion injects the element of intentional
discrimination, it becomes an equal protection claim, not one of a Sixth Amendment stripe. Accordingly, that contention is addressed in Part II. For purposes of completeness, however, the Court here considers, and rejects, the defendants' wholly erroneous contention that inner city renters, many of whom may be minorities, are somehow a cognizable group that has been systematically excluded from the jury selection process in an impermissible manner.
At the outset, the defendants cannot surmount Duren's first element of establishing "renters" as a distinct or cognizable group for Sixth Amendment purposes. They have cited no case or primary legal authority to support such an expansive view.[15] Further, their attempts to aggregate Blacks and Hispanics into a group labeled "renters" does not at all transmute or otherwise transform the individual cognizable racial groups of Blacks and Hispanics into a purportedly larger cognizable group called "minority-renters," much less "renters" generally. See Prince, 907 F. Supp. at 1247 (wherein the district court noted, "This court does not understand the requirement of a distinctive group under Duren to allow various groups to be `lumped' together into one distinctive group called `minorities.' Any group of persons which might casually be referred to as `minorities' would have no internal cohesion, nor would it be viewed as an identifiable group by the population at large"); Wilkins v. State,270 Md. 62, 68, 310 A.2d 39, 42 (1973) (dismissing the contention that non-registered voters' " `common failure to vote is a cohesive factor which binds all of them together in a community of interest,'" and recognizing that "`[a]ll that such persons have in common is their failure to exercise the right of franchise at a given election'") (quoting United States v. Greenberg, 200 F. Supp. 382, 391 (S.D.N.Y. 1961)). Accordingly, any attempt by the defendants, in bootstrap fashion, to tug renters into a distinctive cognizable group, within the templates limned by Duren and its progeny, is an unavailing effort.
Thus, the defendants' inability to circumscribe renters as a cognizable group is, by itself, ample reason to reject their "renters" theorum, as it fails at the very outset to satisfy Duren's first essential element. Even further flawed is their attempt to demonstrate Duren's requisite element of systematic exclusion.
In their strained attempt to theorize systematic exclusion of renters, a non-cognizable group in any event, the defendants fasten upon considerations gleaned from Dr. Michelson's findings, such as renters' lesser involvement in the voting process, their lower likelihood to register for local licenses, and their inherent mobility and transitory nature (See Part II, infra, identifying such factors). However, systematic exclusion, if any there be, must be attributable to and caused by state action. Private sector influences, such as cultural patterns, residential mobility, linguistic isolation, and, indeed, personal disinclinations to vote or to register for drivers' licenses, do not establish systematic exclusion for purposes of a Sixth Amendment challenge (or, for that matter, an equal protection claim of intentional discrimination. Part II, infra). Gibbs, 274 Conn. at 596-97, 758 A.2d at 340; United States v. Purdy, 946 F. Supp. 1094, 1103 (D.Conn. 1996),aff'd, 144 F.3d 241 (2nd Cir. 1998) (quoting United States v. Rioux,930 F. Supp. 1558, 1578 (D.Conn. 1995), aff'd, 97 F.3d 648 (2nd Cir. 1996)) ("[U]nder the systematic exclusion requirement the assessment of jury representativeness should take into account only `affirmativegovernmental action' and not `private sector influences' ") (emph. added); see Barber v. Ponte, 772 F.2d 982, 997 (1st Cir. 1985) (en banc) ("Because a true cross section is practically unobtainable, courts have tended to allow a fair degree of leeway in designating jurors so long as the state or community does not actively prevent people from serving or actively discriminate") (emph. in original).
Noninclusion of renters in a jury pool cannot therefore be attributed to something that the State has caused by its jury selection procedures. Instead, their noninclusion in the venires is a result of external factors, all or any of which may cause renters affirmatively to separate themselves from the system. Such does not at all constitute "deliberate and systematic" denial of their constitutional rights by the State.Gibbs, 254 Conn. at 596-97, 758 A.2d at 340 (emph. added); Weaver, 267 F.3d at 244 (an "underrepresented group [that] has freely excluded itself quite apart from the system" is not indicative of systematic exclusion).
Further, the State is under no duty to offset the effects on the jury selection system of individual patterns of behavior occurring externally to the system. As the Rioux district court noted, "The underrepresentation complained of by the defendant is not `due' to any element of the jury selection system . . . . Rather, it is `due' to suchprivate sector influences as voting patterns, demographic trends, and cultural differences," and "[b]ecause the Sixth Amendment does not impose an affirmative obligation on the courts to counteract such influences, the failure to do so cannot constitute systematic exclusion." Rioux, 930 F. Supp. at 1578, aff'd, 97 F.3d 648 (2nd Cir. 1996) (emph. added);United States v. Cecil, 836 F.2d 1431, 1447 (4th Cir. 1988) (noting that " `[d]isparities . . . can frequently be attributed to personal predilection . . . as opposed to state or locally imposed impediments. And courts have uniformly maintained that such predilections cannot form the basis of a cognizable class and evoke judicial sanctions against the selection system' ") (quoting Foster v. Sparks, 506 F.2d 805, 817 (5th Cir. 1975)); People v. Smith, 463 Mich. 199, 206, 615 N.W.2d 1, 3 (2000) (recognizing that "the influence of social and economic factors on juror participation does not demonstrate a systematic exclusion of African-Americans. The Sixth Amendment does not require [the government] to counteract these factors").
* * * * *
In all, there is nothing before this Court that supports any part of the defendants' claim of systematic exclusion under Duren's requisite third element. Their failure to make such a prima facie showing of this essential element (quite apart from their inability to surmount Duren's second requirement) therefore forecloses their Sixth Amendment challenge.
 II. EQUAL PROTECTION
The second thrust of the defendants' motion is premised on an alleged violation of the due process/equal protection doctrine embraced by the Fourteenth Amendment to the United States Constitution. In order to succeed under an equal protection claim, a defendant shoulders the burden of demonstrating a prima facie case that:
 "the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. . . . Finally, . . . a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing." Castaneda, 430 U.S. at 494 (internal citations omitted).
The analysis of an equal protection claim in jury selection cases is somewhat comparable to that of a Sixth Amendment challenge. It is not identical, however.
In both instances, a defendant must demonstrably identify a cognizable group that is the subject of the alleged underrepresentation. As noted in the Sixth Amendment discussion in Part I (1), the defendants have properly identified Blacks and Hispanics as cognizable groups, but the defendants cannot succeed in an attempt to classify the residents of or the vicinages of Providence, Central Falls or Pawtucket as distinct groups themselves. Moreover, and as explicated in Part I (3)(A), the defendants' suggestion that renters are somehow a distinct cognizable group is meritless.
The Sixth Amendment's fair cross-section element (Duren's second prong) also spans Castaneda's second requirement to demonstrate underrepresentation. Because of their inability to overcome Duren's
second requisite element, the same result obtains in the defendants' equal protection challenge: The absolute disparity percentiles for Blacks and Hispanics in the subject cities do not transgress constitutional limits. See Part I (2).
The distinctive issue in their equal protection claim is not whether the defendants have shown systematic exclusion, an essential element that they have wholly failed to show in their Sixth Amendment challenge. See
Part I (3). Instead, the key element that they must demonstrate in their equal protection claim is a prima facie case of deliberate and purposeful intent to discriminate. Put plainly, "discriminatory purpose" is an "essential element" of an equal protection challenge. Duren, 439 U.S. at 368 n. 26; Castaneda, 430 U.S. at 493 (substantial underrepresentation of a group is impermissible "if it results from purposeful discrimination") (emph. added); Royal, 174 F.3d at 6 n. 2 (explicitly noting that a defendant who asserts an equal protection claim must demonstrate, inprima facie fashion, the necessary element of intentional
discrimination); Ramseur, 983 F.2d at 1225-26.
So, too, the Rhode Island Supreme Court has, on a number of occasions, expressly held that a defendant who alleges such an equal protection challenge must demonstrate intentional discrimination. Jenison, 122 R.I. at 153 n. 7, 405 A.2d at 9 n. 7 (defendant has the burden of demonstrating the existence of purposeful discrimination); State v.Johnson, 116 R.I. 449, 457, 358 A.2d 370, 375 (1976) (a defendant must prove a "preconceived plan" by those who formulate jury lists); accordState v. Gaines, 528 A.2d 305, 308 (R.I. 1987); DeWitt, 423 A.2d at 831;State v. Clark, 112 R.I. 270, 275, 308 A.2d 792, 795 (1973).
In their initial offering in March of 2001, the defendants conceded that the underrepresentation that they perceive in grand and petit juries is "not because of deliberate intent." Defendants' Memorandum at 1. Two years later, in their Reply Memorandum, they disavow that acknowledgement. The slender reed upon which they now seek to support their contention of purposeful discrimination is premised upon their acceptance of a portion of Dr. Michelson's report relating to the demographics of renters.
Even before they attempt to pursue such a claim of intentional discrimination under an equal protection theory, however, the defendants still must initially show that "renters" are a cognizable group. They cannot do so. For the same reasons that their efforts failed in the context of their Sixth Amendment claim, they similarly fail in an equal protection context. See Part I (3)(A). On that basis alone, their new claim is decidedly defective.
The Court nonetheless undertakes an examination of the defendants' contention of purposeful discrimination if only to demonstrate its inherent lack of merit in any event. The defendants' argument is bottomed on Dr. Michelson's stipulated findings concerning renters. These findings devolve to the following considerations, which the defendants have embraced in the parties' Statement of Agreed Facts (Exhibit A, ¶¶ 47-59):
• Many minorities reside in the inner cities of Providence, Pawtucket, Woonsocket, and Central Falls.
• Inner city residents are more likely to rent than own their homes.
• Renters are more transient, more likely to relocate, and are, therefore, less likely to be included in the jury lists for those communities.
• Renters are less likely to have "jury attaining behavior" (¶ 51) and less likely to participate because they typically fail to take deliberate or affirmative steps to register to vote and to obtain drivers' licenses.
From all of this the defendants entreat the Court to find, inferentially, purposeful racism by the State. That contention has neither legal nor factual merit. See United States v. Grisham,63 F.3d 1074, 1082 n. 9 (11th Cir. 1995) (even in a hypothetical community an intent to discriminate cannot be inferred). The federal and state courts, as well as the Rhode Island Supreme Court, have steadfastly held that a defendant must factually demonstrate purposeful and intentional discrimination resulting from governmental action. As pointedly stated by the Rhode Island Supreme Court on more than one occasion:
 "[D]efendants who raise the issue of the absence from a jury of representatives of an identifiable segment of the community must prove that the absence is due to a preconceived exclusionary plan by those responsible for the formulation of the jury lists." (emph. added) DeWitt, 423 A.2d at 831; accord Gaines, 528 A.2d at 308; Johnson, 116 R.I. at 457, 358 A.2d at 375; Clark, 112 R.I. at 275, 308 A.2d at 795.
The defendants have made no such showing.
Their misguided attempt to analogize Rhode Island's jury selection process to the deliberate, impermissible procedures that were invalidated by the United States Supreme Court in Thiel v. Southern Pacific Co.,328 U.S. 217 (1946) and United States v. Glasser, 315 U.S. 60 (1942), is without basis. In Thiel, the court clerk and the jury commissioner admitted to having deliberately excluded daily wage earners from the jury lists. In Glasser, various women were purposely and impermissibly targeted for exclusion. The defendants' efforts to draw supportive comparisons from these two cases serve only to magnify the deficiency of their position. They have not and cannot point to anything in the Rhode Island system that purposefully targets any segment of the community for exclusion from jury service, much less any deliberate effort to exclude renters over homeowners.
If Rhode Island's Jury Commissioner or his agents had actively and deliberately excluded community members in compiling the venires, or if the selection process included racial designations on the juror questionnaires that provided an easy opportunity for racial discrimination, or if the current methods reflected other highly subjective procedures that invited racial/ethnic discrimination, then such would constitute an equal protection violation. Alexander v.Louisiana, 405 U.S. 625, 630 (1972); Castaneda, 430 U.S. at 497. None such exists in this case.[16]
The defendants can draw no support whatsoever from Dr. Michelson's report for their "renters" hypothesis of purposeful or deliberate discrimination. The considerations they point to as supportive of their theory have been deemed entirely external to the jury selection process and demonstrate neither systematic exclusion nor deliberate discrimination by the State. See Part I (3)(A). Just as such external influences have no bearing on a Sixth Amendment claim of systematic exclusion, neither do they carry any weight in the defendants' equal protection allegation of intentional discrimination. As the Connecticut Supreme Court has aptly stated:
 "In the present case, the defendant has produced no evidence that Connecticut's jury selection system is capable of `deliberately and systematically' denying Hispanic persons the opportunity to be selected for jury service by excluding them from jury arrays. Rather, the factors that the defendant claims as proof of discriminatory intent, for example, the use of outdated addresses, and the number of no-shows for jury service in the Hispanic community, clearly were shown to be the product either of random chance, or of factors external to the system. As the trial court found, there is a greater occurrence of undeliverable jury summonses and failures to report for jury service in the Hispanic community than in the general population, not as a result of racial discrimination, but in the main because of residential mobility and linguistic isolation. These facts do not show a `deliberate and systematic' denial of rights." Gibbs, 254 Conn. at 596-97, 758 A.2d at 340 (emph. in original).[17]
* * * * *
The defendants have not shown and cannot demonstrate a scintilla of racially motivated prejudice by those who administer Rhode Island's jury selection process, much less any purposeful exclusion of minorities from the venires. In the end, the defendants' initial assessment of the jury selection system was the correct one: Any perceived underrepresentation is "not because of deliberate intent." Indeed, to the extent that there has been any intentional action by the State, it reflects affirmative efforts by the Legislature as well as the Judiciary to enroll more minorities, not to exclude them.
Accordingly, the defendants' equal protection claim must also fail.[18]
 CONCLUSION
It is now common ground that race and ethnicity are impermissible proxies for juror competence and impartiality, and that a defendant has a constitutional right to expect that a jury selection process, be it grand or petit, will not be affected by impermissible racial bias. UnitedStates v. Lara, 181 F.3d 183, 193 (1st Cir. 1999). Although this Court has held herein that the defendants have not met their requisite legal
burden of establishing prima facie showings of unconstitutionality, a distinction must be made between what violates the law and what, although not amounting to a violation, may still be an undesirable situation.Royal, 174 F.3d at 12.
Some of the material that has been offered, although not reaching unconstitutional levels, is nonetheless unsettling,[19] but as the First Circuit has observed "[T]here is a difference between the optimal results which particularly well administered jury plans . . . can achieve, and the minimum which the Constitution requires." Anaya v.Hansen, 781 F.2d 1, 7 (1st Cir. 1986); United States v. Reyes,934 F. Supp. 553, 566 (S.D.N.Y. 1996) (a finding that "disparities are not unconstitutional is not the same as an endorsement of such discrepancies").
Accordingly, in addition to the steps already taken, it would be appropriate for Rhode Island authorities to consider instituting further measures in their ongoing efforts to increase jury participation by all Providence County residents, and, more particularly, by inner city minority residents. Consideration should be given, for example, to a more expeditious method of tracking current addresses of potential jurors and to more productive follow-ups with respect to prospective jurors who do not return their quailfication forms or whose questionnaires are returned as nondeliverable;[20] as well as installing more convenient mechanisms for DMV licensing and instituting better outreach programs that further encourage voter registration.
Consideration may also be given to increasing juror stipends from a paltry $15 per day to $40 per diem, the amount currently accorded to federal jurors; mandating that private sector employers compensate, at least in part, their employees who are engaged in jury service; designating parking areas for jurors and/or reimbursing them for parking fees; and, reimbursing jurors for day care expenses.[21]
The spectrum of choices is limitless, but the options are not limited solely to the two extremes of either standing pat or implementing the full panoply of all conceivable measures. Those who have the authority to make such choices can come down anywhere in the middle that may be appropriate. In part, implementing many such emendations will, of course, be affected by budgetary and financial constraints in both the public and private sectors. Some such modifications may be attainable now or in the short run, while others may have to await closer scrutiny.
Nevertheless, after close and careful consideration of all of the defendants' contentions, this Court finds that no constitutional or otherlegal infirmity currently exists that justifies dismissal of this indictment or that now precludes a jury a trial on the merits of the charges contained therein. The defendants' motion is therefore denied.
[1] The defendants' claims are also premised on the Rhode Island Constitution and federal and state statutes (the Federal Jury Selection and Service Act, see 18 U.S.C. § 243 (2003); 28 U.S.C. § 1861, etseq. (2003), and R.I.G.L. 1956 § 9-9-1, et seq. (2002), respectively). Those parallel claims are analyzed in the same manner as the federal constitutional challenges. United States v. Sanchez,156 F.3d 875, 879 n. 3 (8th Cir. 1998) ("We analyze the [federal Jury Selection and Service] Act and the Sixth Amendment's fair-cross-section requirement under identical legal standards"); accord United States v.Lara, 181 F.3d 183, 191 (1st Cir. 1999); United States v. Royal,174 F.3d 1, 6 (1st Cir. 1999); see State v. Gaines, 528 A.2d 305, 308-09 (R.I. 1987) (no showing of unconstitutional jury plan or a violation of the Rhode Island statute); see also Peters v. Kiff, 407 U.S. 493, 497-98 (1972) (plurality opinion); Hansen v. United States, 393 F.2d 763, 766-67 (8th Cir. 1968). Accordingly, to the extent that these defendants also base their challenges on federal and state jury selection statutes and the Rhode Island Constitution, they shall be governed by the Sixth Amendment and equal protection rulings in this Decision.
[2] Although the defendants are neither Black nor Hispanic, they are not prevented from pursuing this motion. "A criminal defendant has standing to challenge exclusion resulting in a violation of the [Sixth Amendment] fair-cross-section requirement, whether or not he is a member of the excluded class." Duren v. Missouri, 439 U.S. 357, 359 n. 1 (1979). Likewise, the defendants have standing to assert an equal protection claim in the context of a challenge to the jury selection process, irrespective of whether they are Black or Hispanic. Campbell v.Louisiana, 523 U.S. 392, 400 (1998) (the defendant, "like any other white defendant, has standing to raise an equal protection challenge to discrimination against black persons in the selection of his grand jury"); Powers v. Ohio, 499 U.S. 400, 415 (1991) ("[A white] defendant in a criminal case can raise the third-party equal protection claims of [Black] jurors excluded by the prosecution because of their race"); Statev. Austin, 642 A.2d 673, 677-78 (R.I. 1994) (white defendant had standing to assert equal protection claim on behalf of Black juror excluded by prosecutor's use of race-based peremptory challenge).
[3] With respect to the experts, it is most regrettable that these well-credentialed Ph.D's have chosen this forum as an arena in which to personally disparage one another. Such sniping includes, for example, Dr. Michelson's labeling Dr. Beveridge's efforts as "unintelligible" and "lack[ing] . . . diligence;" and Dr. Beveridge's tagging Dr. Michelson's efforts as "strange" and belittling him for "nitpicking" Dr. Beveridge's assertions (a rather anomalous complaint by Dr. Beveridge, whose own approach to this case is largely driven by the niceties of mathematics and statistics). Michelson, Exhibit C thereto, pp. 1, 6; Beveridge II, at ¶ 3, 47.
Such frivolous objurgations might somehow provide these two with a measure of personal satisfaction or self-approbation, but they assist the Court not at all. They are wholly irrelevant distractions that serve only to diminish and obscure their presentations. To the extent that this Court finds their proffers relevant to the legal analysis of the instant matter, reference will be made thereto.
[4] The defendants have suggested that it is unclear whether the Sixth Amendment fair cross-section requirement applies to grand jury venires. The Court does not agree. The Rhode Island Supreme Court has examined a fair cross-section challenge to a grand jury venire in the context of the Due Process Clause of the Fourteenth Amendment. State v. Jenison,122 R.I. 142, 149-50, 154, 405 A.2d 3, 7, 10 (1979) (observing that "a state electing to use the grand jury system must abide by the requirements of due process in assuring that the selection process draws jurors from a fair cross section of the community"); see Rayburn v.State, 495 So.2d 733, 735 n. 1 (Ala.Crim.App. 1986) (citing Taylor v.Louisiana, 419 U.S. 522 (1975) and noting that "[t]he Sixth Amendment . . . is limited in its application to petit juries") (emph. added). Accordingly, the defendants' grand jury challenges are governed by the Court's holdings in Part II of this Decision, addressing their due process/equal protection claim.
[5] Only when "geography . . . [is] a proxy for another, recognized distinct group" that is "profoundly culturally distinct," have courts found residents of a geographic location to be a cognizable group. UnitedStates v. Traficant, 209 F. Supp.2d 764, 782-83 (N.D.Ohio. 2002) (discussing instances involving the geographic exclusion of Native Americans and Alaskan Natives in which courts found the jury selection process violative of the fair cross-section requirement); see, e.g.,United States v. Tranakos, 690 F. Supp. 971 (D.Wyo. 1988), aff'd,911 F.2d 1422 (10th Cir. 1990) (holding geographic exclusion of residents of Native American reservations constituted exclusion of a "cognizable group"); Alvarado v. State, 486 P.2d 891 (Alaska 1971) (invalidating as Sixth Amendment violation the geographic exclusion of Alaskan Native villagers). No such exception presents itself in the instant action, andto the extent that these defendants assert one, directly or impliedly,any such claim is unavailing.
[6] Absolute disparity measures the difference between the percentage of the cognizable class in the population and the percentage of that group represented in the venire. This test has proven useful and has been approved by numerous state and federal courts, including the United States Court of Appeals for the First Circuit. United States v. Royal, 174 F.3d 1, 9-10 (lst Cir. 1999). The substantial impact test focuses on whether the underrepresentation substantially affects the composition of the jury. The substantial impact test begins with the percentage in the total population of the allegedly underrepresented group, and multiplies this figure by the number of persons in the jury array. This comparison yields the number of jurors from that group that should have been selected for jury service if the array mirrored accurately the percentage in the total population of the allegedly underrepresented group. This number is then compared to the number of persons from the group that actually were selected for the array. The difference between those two figures, namely, the additional number of jurors from the group that would be necessary to eliminate any underrepresentation, is then examined to determine whether it is "substantial." Comparative disparity is calculated by subtracting the percentage of the cognizable group in the challenged jury pool from the percentage of the cognizable group in the relevant population, and then dividing that amount by the percentage of the cognizable group in the relevant population. Comparative disparity is designed, therefore, to measure the decreased likelihood that members of an underrepresented group will be called for jury service, in contrast to what their presence in the community suggests it should be. Statisticaldecision theory calculates probabilities and measures the likelihood that underrepresentation could have occurred by sheer chance. Under this method, if one can determine that it is statistically improbable that the jury pool resulted from random selection, then there is an imperfection in the jury selection system.
[7] The disparity of risk test purportedly measures "the likelihood that the difference between a group's representation in the jury pool and its population in the community will result in a significant risk that the jury will not fairly represent the group." Commonwealth v. Arriaga,438 Mass. 556, 566-67, 781 N.E.2d 1253, 1265 (2003); see Peter A. Detre, Note, A Proposal for Measuring Underrepresentation in the Composition ofthe Jury Wheel, 103 Yale L.J. 1913 (1994).
[8] Although the absolute disparity method may have a few detractors, it has generally withstood scrutiny and, as noted in the text above, has emerged as the favored approach. Indeed, the California Supreme Court recently noted that, in Duren, the United States Supreme Court itself employed an absolute disparity statistical analysis. People v. Burgener,29 Cal.4th 833, 860, 62 P.3d 1, 22 (2003).
The other statistical approaches urged by these defendants are not the most reliable tools in the shed and have invited more than a modicum of criticism. As noted in the text, the disparity of risk method has received no reported judicial plaudits. The comparative disparity test has been criticized because it invites distortion of the alleged underrepresentation. Burgener, 29 Cal.4th at 860, 62 P.3d at 22. It is "strongly disfavored" in the Ninth Circuit because "it exaggerates the effect of any deviation." Id. (quoting Thomas v. Borg, 159 F.3d 1147, 1150 (9th Cir. 1998)); accord Arriaga, 438 Mass. at 556, 781 N.E.2d at 1265; United States v. Haley, 521 F. Supp. 290, 292 (N.D.Ga. 1981); seeUnited States v. Hafen, 726 F.2d 21, 24 (1st Cir. 1984).
Courts have also noted the limited usefulness of the statistical significance matrix. E.g., People v. Bell, 49 Cal.3d 502, 527 n. 14,778 P.2d 129, 142 n. 14 (1989); State v. Lopez, 107 Idaho 726, 732,692 P.2d 370, 376 (Ida. App. 1984) (observing that "it is one thing to say that a probability calculation is useful evidence; it is quite another to say that it embodies a constitutional standard"); State v.Castonguay, 194 Conn. 416, 421 A.2d 56 (1984). The substantial impact test has apparently not been targeted for as much criticism as the other two methods, and the Connecticut Supreme Court has employed it, but even that court acknowledged that it has been adopted "by only a small number of courts." State v. Gibbs, 254 Conn. 578, 590, 758 A.2d 327, 337 (2000).
[9] The defendants attempt to boost the Providence percentile by combining it with the Central Falls figure. Defendants' Memorandum at 21. Such geographical aggregation is inappropriate; and, even were it somehow proper, that combination (12.10%) would still be borderline and not exceed levels that have been deemed allowable. Weaver, 267 F.3d at 241, referencing Ramseur, 983 F.2d at 1233-35.
[10] As earlier noted in Part I (1) and in footnote 5, geographical
locations do not constitute cognizable groups for purposes of the constitutional challenges asserted by the defendants.
[11] One court has, however, questioned Dr. Beveridge's conclusions and, more particularly, the manner in which he presented them to the federal court. Rejecting the defendant's Sixth Amendment jury selection challenge in United States v. Weaver, 267 F.3d 231, 239 n. 7 (3d Cir. 2001), the Court of Appeals pointedly remarked:
 "As we address in our discussion of Weaver's statistical presentation, despite his testimony, Beveridge did not actually analyze the entire master wheel. He testified that he was able to determine the race of nearly every juror on the master wheel based on those jurors indicating their race on the questionnaires sent to them. The master wheel consists of jurors chosen at random from the voter registration rolls, before any questionnaires have been mailed yet. But Beveridge actually examined, and testified based on, the returned questionnaires. For the 1999 wheel, 5,877 questionnaires were mailed. App. at 125. Yet only 4,753 of those were completed and returned. Id. Beveridge did not attempt to account for those not returned, yet consistently testified that he had examined the entire composition of the master wheel."
[12] A juror's name, by itself, does not necessarily denote ethnic origin. As courts have plainly recognized, if a non-Hispanic spouse assumes her husband's Hispanic surname, as may commonly occur after marriage, her name on a jury list will give the erroneous impression that she is of Hispanic descent. By the same token, if an Hispanic spouse takes her Anglo-husband's surname, her ethnicity will also be masked, at least until, say, voir dire. United States v. Esparsen, 930 F.2d 1461, 1466 (10th Cir. 1991); Ovalle v. State, 13 S.W.3d 774, 780 n. 22 (Tex.Crim.App. 2000).
[13] Not all requests for excusal result in outright release from jury service. Eligible jurors not affected, e.g., by domestic or financial hardship, will nonetheless be summoned at a later time if the contemplated service period is simply unworkable for them. Exhibit B, ¶ 14; Exhibit A, ¶ 42. Further, not all excusals are granted by the Jury Commissioner, as they "may happen at different points in the process." Exhibit A, ¶ 35. Regardless of race, an otherwise eligible individual may be excused at the time of jury empanelment by the trial judge and by agreement of counsel for sundry sound reasons; and, although they may include minorities, excusals for cause are commonplace. Similarly, peremptory challenges by the prosecutor or defense counsel of minority jurors during the voir dire process are not impermissible if they are not antithetical to the directives of Batson v. Kentucky,476 U.S. 79 (1986); see Miller-El v. Cockrell, 123 S.Ct. 1029 (2003).
Certain categories of the populace are, by statute, exempted from jury service, such as federal and state legislators, general officers of the State, judges, lawyers, as well as police and fire department personnel. R.I.G.L. 1956 § 9-9-3 (2002); Exhibit B, ¶¶ 28, 34. Such individuals are, however, not precluded from serving (Exhibit B, ¶ 18), and many have voluntarily waived those exemptions and have appeared in the venires, including governors and judges.
[14] Moreover, federal and state constitutions do not impose a duty upon local governments to relieve economic hardship suffered as a result of an individual's service on a jury. Burgener, 29 Cal.4th at 857, 62 P.3d at 20 ("The existence of hardship excuses . . . did not deprive defendant of his right to a fair cross-section of the community. Neither the state nor federal Constitutions oblige local government to increase jury fees or otherwise ameliorate the economic hardship caused by jury duty").
[15] Instead, the defendants seek support from two entirely inapposite United States Supreme Court decisions: Thiel v. Southern Pacific Co.,328 U.S. 217 (1946), and Glasser v. United States, 315 U.S. 60 (1942). As is noted in Part II of this Decision, neither of those cases has any application to the defendants' claims.
[16] Dr. Beveridge suggests that Rhode Island's juror questionnaire, which is returned by mail directly to the Jury Commissioner's office and open to inspection by all personnel therein (See Exhibit A, ¶¶ 29, 33, 39), should contain questions to extract a juror's race or Hispanic status "since such information is routinely collected for the Federal District courts." Beveridge II, ¶ 26. His assertion, however, significantly fails to note that although federal questionnaires may ask for such information, a response thereto is not at all obligatory if a prospective juror "finds it objectionable." 28 U.S.C. § 1869(h) (2003). In any event, it is highly questionable whether the Rhode Island Supreme Court would approve of such an inquiry within our jury questionnaires. See Alexander v. Louisiana, 405 U.S. 625, 630 (1972), where the United States Supreme Court criticized the presence of racial designation on juror questionnaires and information cards because it offered a "clear and easy opportunity for racial discrimination."
[17] Other courts have also noted that undeliverable or unreturned jury questionnaires or summonses, and/or failures to follow up those unreturned/undeliverable materials are not deemed to be a violation of constitutional dimension or a violation of the federal Jury Selection and Service Act. United States v. Royal, 174 F.3d 1, 11 (1st Cir. 1999);United States v. Grisham, 63 F.3d 1074, 1082 (11th Cir. 1995).
[18] Because the defendants have failed to demonstrate a prima facie
case on any of their asserted claims, their demand for an evidentiary hearing is without merit. Their insistence on such a hearing was premised on their desire to cross-examine Dr. Michelson on his findings and, as well, to present Dr. Beveridge's materials through his live testimony. Defendants' Reply Memorandum at 1, 7. As set forth in this Decision, however, this Court has found Dr. Beveridge's averments lacking, not because Dr. Michelson's conclusions are necessarily better grounded, but principally because Dr. Beveridge's own asseverations suffer from and are flawed by conjecture and speculation. Moreover, cross-examination of Dr. Michelson at such a hearing would be wholly acarpous, because the only portions of his findings that have played any relevant or particularized part in this Decision are those that the defendants themselves have identified and embraced in propounding their "renters" theory of systematic exclusion and intentional discrimination, a theory that is legally and factually meritless.
[19] The parties have agreed, for example, that many juror questionnaires are either undeliverable or not returned at all. While undeliverable and/or unreturned juror summonses and unproductive follow-up thereof do not bespeak constitutional infirmity, Gibbs, 254 Conn. at 596-97, 758 A.2d at 340; Royal, 174 F.3d at 11; Grisham, 63 F.3d at 1082, those figures are still disconcerting:
 "Approximately 22,000 to 24,000 juror questionnaires are sent out annually in Providence and Bristol County. Of these, usually 65% are returned completed. Of these, up to one half may be determined to be ineligible as determined by statute, or they may no longer live within the judicial district. . . . In Providence and Bristol County, approximately 18% come back `undeliverable' and 17% do not come back at all. Statewide, the undeliverable rate is usually about 11-12%. . . . In 1999, 20.4% of petit juror questionnaires were returned undelivered, and 15.6% of the grand juror questionnaires were returned undelivered. 23% of petit juror and 20% of grand jury questionnaires were not returned. The total of not delivered and not returned was 39% from the petit jury mailing, and 22.5% from the grand jury mailing." Exhibit A, ¶¶ 31-32, 58.
Further, the absolute disparity percentage suggested by the defendants for the City of Providence (11.14%), although within allowable levels, is disquieting.
[20] Under the current statutory framework, the Secretary of State, every two years, is expected to update the mailing addresses of all listed voters. Changes of address noted by the Secretary of State are then forwarded to local boards of canvassers, who are authorized to delist from the voting rolls those individuals who thereafter do not respond to requests to confirm a change of address. R.I.G.L. 1956 §17-9.1-27 (2002); R.I.G.L. 1956 § 9-9-1(b) (2002); see Exhibit A, ¶¶ 13, 16-17, 32.
[21] Other states have addressed some of these considerations. For example, in Massachusetts, absent a showing of "extreme financial hardship," employers are required to pay employees who are engaged in jury service (grand or petit) their regular wages for three days. Thereafter, the Commonwealth compensates jurors at $50 per day until their service has been completed. Mass. Gen. Laws ch. 234A, §§ 48, 49, 51 (2003); see Conn. Gen. Stat. §§ 51-247(a), (c) (2003) (mandating that employers pay employees' regular wages for the first five days of jury service and providing juror compensation at a rate of $50 per day for each juror who serves more than five days); Minn. Stat. § 593.48 (2002) (allowing reimbursement of jurors' day care costs); N.H. Rev. Stat. Ann. § 500-A:17 (2002) (providing for free parking for jurors); Okla. Stat. tit. 28, § 86 (2003) (requiring reimbursement for jurors' parking expenses).
For a wide-ranging view of suggested methods to increase juror participation, see, e.g., Robert G. Boatright et al., Improving CitizenResponse to Jury Summonses: A Report with Recommendations, AmericanJudicature Society (1998); Greg Moran, When Jury Duty Calls —Counties Wrestle with High Evasion Rates: And What Courts Can Do AboutIt, California Lawyer, May 2001, at 22; Court Review — The Journalof American Judges Association, Vol. 36, Fall 1999, pp. 79-80, collecting numerous sources and websites relating to jury reform; Robert G. Boatright, Why Citizens Don't Respond to Jury Summonses, 82 Judicature
156 (Jan. — Feb. 1999); Jury Reform, Council for Court Excellence,
Washington, D.C., available at www.courtexcellence.org.